[No. 4842–II. Division Two. January 15, 1982.]

THE STATE OF WASHINGTON, *Respondent*, v. BARON J. KING, *Appellant*.

*John H. McGilliard* and *William M. Crawford,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Kenneth G. Bell, Deputy,* for respondent.

PETRICH, A.C.J.—Baron J. King contends that his conviction of first degree theft in violation of RCW 9A.56.030 rests on insufficient evidence. He further argues that the trial court erred in denying his motion to exclude the out–of–court and in–court identification by Albert R. Smith of his jacket. We affirm.

On February 1, 1980, after cashing his monthly pension check of $884 at a downtown Bremerton bank, Albert R. Smith entered a nearby tavern to have a few beers before catching his 3:45 p.m. bus. Smith sat midway down the bar, approximately 25 to 30 feet from the end nearest the entrance. Then 64 years of age, Smith was taking daily medications of Dioxin, Tylenol, potassium chloride, Aldactone, and Dalmane.

Also in the tavern that afternoon was the defendant who sat down at the end of the bar nearest the main entrance. Another patron, Thomas Cutler, who was two seats away from defendant, testified that defendant was a black man, approximately 6 feet in height; that he wore a brown leather jacket, a tan scarf, and a black hat; that he carried a

white paper bag with blue lettering and; that he sported a goatee. Cutler, as well as the barmaid, also testified that defendant ordered two beers upon entering and that he was soon joined by another, somewhat shorter black man.

Shortly before leaving, Smith walked to the back of the tavern to use the men's restroom. On the way there, he noticed a black man who followed him for a short while before sitting down in a booth. On Smith's way back to his original seat, this man said, "Hello, pop, how you doing?" Smith did not recognize this man; furthermore, he remembered seeing three to four other blacks in the tavern.

Cutler testified that at one point defendant and his companion walked toward the far end of the building, returned a few minutes later, took a few quick swallows of beer, and then left. Approximately 2 minutes later, Cutler remembered seeing Smith talking to the tavern's owner about his being jostled and pickpocketed in the tavern's foyer.

When Smith left to catch his bus, he exited through the tavern's foyer. There, two men approached him, held his head, and began to jostle him. Because Smith recently had gone through two major operations in his thoracic area, he tried to bend over for greater protection. When his assailants were leaving the tavern, Smith observed that the arm of one of them was clad in a brown jacket and that the men ran in different directions after reaching the street. Somewhat dazed and shaken by this experience, as well as by the dawning realization that his wallet containing at least $884 was missing, Smith continued out to the street where he met the tavern's owner who led him back inside and ordered the barmaid to call the police. The report was broadcast at 3:51 p.m.

Defendant, meanwhile, had entered a nearby Penney's store where he struck up a conversation with a female shopper and began following her around the store. He informed her he was from Alaska and continued to follow her to another nearby store and then to her car. He then suggested they both drive to a store in East Bremerton to find the item for which she had been shopping; she refused.

Defendant then left her but was soon stopped by the police, who at 4:05 p.m. had just received a more detailed description of the suspect.

The police drove defendant back to the tavern for a witness identification. While defendant sat in the back seat, Smith walked around the car looking at defendant. Although he did not recognize defendant's person or any facial features, Smith did recognize the brown leather coat. Apparently, Smith had initially stated that he had observed a brown cloth coat. After other witnesses identified defendant as the man who had been sitting at the end of the bar, the police formally arrested the defendant. Only a few dollars were in defendant's possession.

Later, after proper *Miranda* instructions had been given, defendant told Detective John Stonehouse that he had just arrived alone from Portland and that after having left the tavern on the day in question, he checked his luggage in at the Arcade building next to the tavern and then played several games of pool. Upon leaving the Arcade, he stated that he then met a girl with whom he walked to some nearby stores before leaving her and being arrested.

Employees in the Arcade, however, testified that defendant had first appeared on January 31, 1980, with three other men, all of whom deposited their luggage there for the day. Furthermore, they testified that the next day defendant again deposited his luggage with them around 10 a.m. and never returned to pick it up.

After an earlier mistrial, retrial began on May 15, 1980, and the jury returned a guilty verdict on the charge of first degree theft on May 19, 1980. Defendant claims that the court erred in not granting his motion to dismiss because of insufficient evidence. He also alleges error in one of the court's conclusions of law contained in an order denying defendant's motion to exclude the out–of–court and in–court identification by Smith of defendant's jacket.

We turn first to the latter issue of whether the court properly allowed into evidence such identification by Smith. We note that the court concluded as a matter of law

that "an inherently suggestive identification procedure was employed since the defendant was displayed to the witnesses in a one–on–one showup." The court also concluded that under the "totality of the circumstances test of *Neil v. Biggers,* the out–of–court identification of the defendant by Thomas Cutler is admissible." The court then ruled admissible the out–of–court identification of defendant's jacket by another witness and by Smith, and it declined to apply the standards of *Neil v. Biggers,* 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), "because the out–of–court identification was of the jacket and not of the defendant."

Because of the inherently suggestive nature of one–on–one showups, certain guidelines have been adopted to ensure the reliability of such identifications and to guarantee defendant his due process rights.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*State v. Christianson,* 17 Wn. App. 264, 268, 562 P.2d 671 (1977); *accord, Neil v. Biggers, supra.* Defendant would have us apply these guidelines to situations when a witness identifies an article of clothing worn by a suspect at a showup. This we will not do.

 The famous trilogy of cases that point out the dangers of a showup identification only address their concerns to the proper identification of the person. *See United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967); *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967); *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967). Similarly, the *Neil v. Biggers* guidelines intended to ensure that a one–on–one showup identification of a person would not succumb to its own inherent dangers. Other than to an identi-

fication of a person, these guidelines have only been applied, for obvious reasons, to identifications of photographs of individuals. *See Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968); *State v. Hewett,* 86 Wn.2d 487, 545 P.2d 1201 (1976).

Witnesses routinely make identifications of individual persons as well as of inanimate objects. Distinctive of the former category is the uniqueness of every person. Indeed, Sir Thomas Browne once quipped: "It is the common wonder of all men, how among so many millions of faces there should be none alike." Religio Medici, Pt. 2, § 2 (1642). If, then, a witness identifies an individual as the perpetrator of a crime, not only will that be direct and highly persuasive evidence against defendant, but also the eyewitness will be reluctant to change his identification. *See United States v. Wade, supra,* at 229. Any misidentification of a person's visage is thus likely to become irreparable. The *Wade–Gilbert–Stovall* trilogy, therefore, recognized the importance of eyewitness identifications, which, by their very nature, carry so much weight with juries, and which necessitate the *Neil v. Biggers* safeguards.

By comparison, a witness who identifies a piece of clothing which is essentially the same in appearance as hundreds or thousands of others is not only more likely to change his mind, but his credibility before the trier of fact may be readily challenged. Thus, for example, although Smith told the jury "Yes, that's the brown jacket," reasonable cross-examination could have elicited the admission that it only looked like the jacket or that it was an identical jacket though not necessarily the one worn by his assailant. This type of identification is one more item of circumstantial evidence. Although it may be crucially important when surrounded by other pieces of evidence, by itself it has little value.

With these considerations in mind, we turn to the instant facts. Smith identified the jacket while it was being worn by defendant who was then sitting alone in a police car. This situation is certainly different than one where the police

present the victim with a jacket, sans suspect, for identification purposes. We are, therefore, hesitant to conclude that the entire situation was not somewhat suggestive to Smith's identification of the jacket, even though he did not identify the defendant. Nevertheless, the identification of the jacket being worn by defendant could not create an irreparable misidentification within the protective scope of *Neil v. Biggers*. The victim might admit upon questioning that the jacket was not necessarily the one his assailant wore, and although the victim's identification of the jacket linked defendant to the crime, such linkage was not inextricable but only circumstantial. Short of the point of irreparable misidentification, such evidence is for the jury to weigh; even evidence with some element of untrustworthiness is customary grist for the jury mill. *See Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977).

We next turn to the issue of whether the court erred in denying the defendant's motion for dismissal because of insufficient evidence. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a *finding of guilt beyond a reasonable doubt*." (Italics ours.) *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). Thus, after viewing the evidence in the light most favorable to the prosecution, we must ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, supra; State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

RCW 9A.56.030 defines first degree theft as theft of property of any value taken from the person of another. After carefully reviewing the record, we conclude that there was sufficient evidence by which a jury could find defendant guilty of first degree theft.

Accordingly, we affirm.

PEARSON and PETRIE, JJ., concur.