**UNITED STATES of America,**

v.

**Patrick McNIECE, Defendant.**

**No. CR 82–374.**

United States District Court,
E.D. New York.

March 3, 1983.

with violating Title 18 of the United States Code, Sections 2115 and 641, wherein it is alleged that he stole a certain quantity of cash and postage stamps from the Rosebank Postal Station in Staten Island, New York. In a motion to suppress and at a pretrial hearing thereon defendant challenged the admission of evidence at trial relating to identification actions of a German Shepherd, Harrass II, and the testimony of the dog's trainer, Mr. John Preston.

Mr. Preston, who is the director of Preston Kennels and a deputy sheriff in Potter County, Pennsylvania, has trained and handled dogs for man-trailing since 1974 (Tr. at 10–12) and for lineup purposes since 1976. (Tr. at 13). Harrass II, a Schutzhund III German Shepherd, was purchased by Mr. Preston in 1977 from an organization in West Germany which had trained the dog for three years. (Tr. at 18). Since acquiring Harrass II, Mr. Preston has utilized the dog in over 500 man-trailing cases and in over 1000 lineup situations. According to Mr. Preston, Harrass II has "never been proven wrong." (Tr. at 21).

The Government seeks to admit at the trial a videotape and testimony as to a lineup in which Harrass II was used. At this lineup, the dog smelled a sock that had been worn by defendant and was then brought into a room in which various tools, including a pair of boltcutters found at the scene of the Postal Station robbery, were spread out on the floor. Upon being exposed to the several tools on display, the dog exhibited a "reaction" to the boltcutters in question, (Tr. at 106), thereby, according to Mr. Preston, "alerting" his trainer that the boltcutters contained a "scent" that was present on the socks.[1] Through Mr. Preston's testimony and the use of a videotape of the lineup, the Government proposes to show that the defendant had been in contact with the boltcutters found at the Postal Station and to argue from this that he committed the offenses charged in the indictment.

---

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Charles E. Rose, Asst. U.S. Atty., Brooklyn, N.Y., for U.S.

Michael L. Santangelo, New York City, for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

The defendant, Patrick McNiece, has been charged in a two count indictment

---

1. The dog exhibited a stronger "reaction" to the bag in which the boltcutters had been contained when the bag was placed in the lineup. (Tr. at 107).

Defendant, citing *United States v. Williams,* 583 F.2d 1194 (2d Cir.1978), argues that this evidence should not be admitted at trial because it has not been established that individuals have unique "scents" or "odors."[2] In *Williams,* the Court of Appeals held that evidence of spectographic voice analysis is admissible for the purpose of identifying a voice as having been employed in the commission of, or in relation to, a crime. The court supported its holding by noting that

> [v]oice analysis thus rests on the non-likelihood that two individuals would have identical vocal cavities and identical dynamic patterns of articulator manipulation, and on the inability of an individual to change or disguise the particular voice characteristics created by his unique combination of cavities and articulator manipulative patterns.

*Id.* at 1197. Thus, defendant contends that a similar finding by this Court—that canine identification rests on the nonlikelihood that two individuals would have identical "odor" characteristics—is required before this evidence may be admitted at his trial.

First of all, it must be noted that defendant does not dispute the fact that the relevant scientific data support the conclusion that a well-trained dog is able to distinguish among the "odors" of specific individuals and is able to detect the "odor" of a particular individual on a particular object. *See, e.g.,* L.W. Davis, Go Find! (1974); E.S.E. Hafez, The Behavior of Domestic Animals 380–81 (copy submitted by Government undated); Kalmus, *The Discrimination by the*

*Nose of the Dog of Individual Human Odours and in Particular of the Odours of Twins,* British Journal of Animal Behavior, 25–31 (1955). In fact, defendant's own olfaction expert, Dr. Robert E. Henkin, unqualifiedly admitted on cross examination at the pretrial hearing that dogs possess these capabilities. (Tr. at 186). Moreover, the dog used in this case has received extensive training in man-trailing and lineup identification, as has Mr. Preston in employing dogs for those purposes. Indeed, both Mr. Preston and Harrass II have been remarkably successful in the past in identifying criminals based on the "odor" characteristics of the suspected persons. During the past year alone, Mr. Preston has performed lineup procedures with Harrass II (similar to the procedure used in this case) in at least 13 homicides and five armed robberies, in which all of the suspects either confessed or pleaded guilty after the lineup. In addition, there have been many cases where, as a result of the dog's failure to "alert" during a lineup, suspects have been released. In fact, as noted above, when questioned by the Court as to Harrass II's percentage of accuracy, Mr. Preston testified that the dog "has never been proven wrong."[3] In this connection, it might be argued that Harrass II may never have "been proven wrong" merely because the defendants who pleaded guilty after being identified feared the potential prejudicial weight of the dog identification evidence if they had gone to trial and because the police who released the suspects who were not identified by the dog

---

**2.** Although we use the terms "odor" and "scent" throughout this opinion, it must be noted that a "dog's ability to discern scent is something unique to him and may not be regarded as similar to our own sense of smell." L.W. Davis, Go Find! 60 (1974). Thus, when a dog is used in a man-trailing situation (or in a lineup), "he is following a trail which he alone recognizes in a way which he alone understands." *Id.* In other words, dogs do not necessarily have the same sense of smell as do humans. Rather, they have either a very heightened or sophisticated sense of smell, or even what we might well term to be an extra sensory perception that provides them with the ability to sense or perceive unique characteristics or special odors that exist in all humans,

thus enabling dogs to distinguish among different humans. This is not as extraordinary as it may seem at first blush. It is universally recognized, for example, that dogs have an auricular sense which enables them to hear high pitched whistles not capable of detection by the human ear.

**3.** See in this connection *United States v. Waltzer,* 682 F.2d 370 at 374 (2d Cir.1982), wherein Circuit Judge Oakes concurred in a panel majority's "reliance on the able, canny canine, Kane, with the perfect record—all hits and no misses—[on the ground that the same] accords with the precedents of this court and common sense."

placed undue emphasis on the reliability of the dog's actions. We think, however, that this dog, which has been employed in over 500 man-trailing cases and in over 1000 lineup situations, has been shown through experience to be sufficiently reliable to submit both the evidence and the question of his reliability to the jury under proper and careful instructions as discussed below. *See United States v. Gates,* 680 F.2d 1117, 1119 (6th Cir.1982).

Defendant is not incorrect, however, in stressing the importance of the *Williams* decision to the issue in this case, as the reliability and probativeness of the dog's actions should be evaluated in a manner similar to the method used by the Court of Appeals to evaluate the reliability and probativeness of the spectrographic voice identification evidence. The first step in this analysis is to determine whether the "instrument" does, in fact, have the capacity to identify the characteristic in question. In the case of the spectrograph, the Court of Appeals found that the scientific data establishes that the instrument is capable of accurately analyzing sound and dispersing it into an array of its time, frequency, and intensity components. Here, as noted above, the scientific data clearly demonstrate that a properly trained dog can distinguish among the "odors" of different persons and can detect the "odor" of a particular person on an object.

The second step in the analysis is to determine whether the characteristic being identified by the "instrument" is unique to the suspect. In the case of the spectrograph, the *Williams* Court recognized the nonlikelihood that two individuals would have "identical vocal cavities" and "identical dynamic patterns of articulator manipulation," and thus it was able to conclude that when two spectrograms "match," then they were produced by the same person. Here, however, the nonlikelihood that two individuals would have similar or identical "scents" or "odor" characteristics has not been established in the scientific community, and it is upon this fact that the defendant's argument is based.

For the following reasons, however, we do not believe that the inability to determine conclusively that individuals have unique "odors" (as recognized by humans) requires the exclusion of this evidence. First, although we have, to this point, evaluated the dog as though it is an "instrument," and therefore for the purposes of our analysis equivalent to the spectrograph, the nonmechanical, animate nature of the dog distinguishes the evidence it produces from the evidence produced by a mechanical, inanimate instrument. Unlike a precise, mechanical instrument such as the spectrograph, which jurors may view as incapable of error, a dog may be seen as more "human-like" and therefore subject to lapses in judgment and perception. Thus, because of the lesser potential prejudicial impact that evidence resulting from a dog's identification may have on the jury, courts need not apply as strict a standard when considering the admissibility of such evidence as they are required to apply when considering the admissibility of the seemingly flawless evidence produced by a mechanical instrument.

Furthermore, the hurdle obstructing the admission of this evidence as a result of the inability to establish that individuals have unique "odors" may also be overcome by a proper charge to the jury. First, the jury will be instructed that before it gives this evidence any consideration or weight, it must find that this dog, Harrass II, has previous actual case lineup experience and that his record in such cases is sufficient to conclude, beyond a reasonable doubt, that his powers of discrimination and identification are reliable. In addition, the jury will be instructed that it may not convict defendant on the basis of the dog's identification alone; rather, it may use such evidence to convict defendant only if it first finds that all the other evidence in the case establishes defendant's guilt by at least clear and convincing evidence. Thus, unlike the case of the spectrograph, in which the nonlikelihood that two persons could produce identical spectrograms has been established and the evidence of which, even when standing alone, may be sufficient to convict a de-

fendant, evidence of a dog's identification, under this instruction, could only be used by the jury to convict in cases where a substantial amount of other evidence is present.

Finally, the admission of dog identification evidence is supported by the great weight of authority in other jurisdictions in so-called man-trailing cases. *See* Annotation, 18 ALR 3d 1221 (1968) and cases cited therein.[4] In the sole reported federal decision addressing the question in this case—*United States v. Gates,* 680 F.2d 1117 (6th Cir.1982)—the Court of Appeals for the Sixth Circuit, in a case involving a lineup identification by the same dog employed in this case, upheld the admission of the dog identification evidence at trial. In that case, Harrass II was given a sandal recovered at the scene of a bank robbery to smell and, after entering a room where a lineup of men had been composed, it walked up to the defendant and placed his head in the defendant's lap. *Id.* at 1118. Although the Court concluded that the evidence other than the dog identification evidence was clearly sufficient to support the jury's guilty verdict beyond a reasonable doubt, it is suggested that the dog identification evidence was properly admissible. In support of this position, the court stated:

> Harrass II was a German Shepherd who received extensive training in Germany and with his American handler Preston.

The dog has been on 100–150 tracking cases. He has tracked in fifteen states and qualified before in court. Preston, the dog's handler, is the owner/director of a kennel which provides 24 hour-a-day nationwide manhunting services for law enforcement agencies. Preston trained in the military and with a civilian tracker. He has been working with dogs for seven years during which time he has been on three hundred manhunts and participated in seventy-seven actual case lineups and again that many demonstrative-type lineups. Preston described his association memberships and the training procedures he employs. He has qualified in court before as Harrass II's handler. *Id.* at 1119.

█ In conclusion, we hold that the evidence of the identification made by this dog, which has received considerable training and has established his reliability in prior cases of man-trailing and lineup identification, is admissible to show that defendant handled the boltcutters found at the scene of the crime. This holding, however, is qualified in that the jury must be instructed that (i) it must first determine beyond a reasonable doubt that the dog, based on his previous lineup record, has demonstrated the ability to identify reliably and discriminate among "odors,"[5] and (ii) if such determination is made, it may use the dog identification evidence to convict de-

---

4. In the typical man-trailing situation, however, the dog may not be searching for the scent of a known individual. For example, the dog may be used to assist in the apprehension of a suspect who is fleeing the scene of a crime through a wooded area. In that situation, the dog's primary role may be to identify the trail of *any* human being passing through the wooded area, and thus the fact that individuals may not have unique odors is not as crucial a question as it is in the case of a lineup identification.

5. In this connection, the Government must prove at the trial beyond a reasonable doubt (1) that the dog is of pure blood and of a stock characterized by acuteness of scent and power of discrimination, and in particular power of discrimination between individual human beings, (2) that the dog has been accustomed and trained to pursue the human track and to discriminate between individual human beings, (3)

that the dog has been found by experience in actual cases to be reliable in such tracking and in such discrimination, (4) that the dog was placed on the scent in a place where the scent of the alleged participant was present on the individual items sought to be identified and (5) that the dog was placed on such scent and for such identification purposes within the period of his efficiency. *See United States v. Gates,* 680 F.2d 1117, 1119 (6th Cir.1980); *People v. Centolella,* 61 Misc.2d 726, 305 N.Y.S.2d 460, 462–63 (Oneida County Ct.1969).

Most particularly, the Government must show beyond a reasonable doubt to the jury's satisfaction that the dog, Harrass II, had previous similar actual case lineup experience and that his record in such cases was sufficient to the jury's finding beyond a reasonable doubt that his powers of discrimination and identification were reliable.

fendant only if the other evidence in the case establishes defendant's guilt by clear and convincing evidence. If the other evidence falls short of that threshold, the jury must ignore the dog identification evidence and acquit the defendant. Only if both these conditions are met may the jury determine from all the evidence in the case whether the defendant's guilt has been proven beyond a reasonable doubt.[6]

Accordingly, defendant's motion to exclude this evidence from his trial must be, and hereby is, denied.

SO ORDERED.

6. Defendant also argues that this Court should exclude the dog identification evidence because the lineup was conducted 21 months after the robbery and the defendant's alleged use of the boltcutters to commit that crime. Although we agree that the probative value of the dog identi- fication evidence might, arguably, be greater if the identification had taken place immediately after the robbery, we do not believe that the 21 month gap warrants the exclusion of this evidence; rather, it should be used to affect the weight given to this evidence by the jury.