SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**State v. Howard Jones** (A-112-13) (073827)

**Argued September 16, 2015 -- Decided January 20, 2016**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court considers the proper analysis for determining the reliability of evidence obtained through a suggestive showup identification procedure.

Defendant was charged with third-degree endangering the welfare of a child, and fourth-degree criminal sexual contact, arising from events that took place on the morning of March 24, 2009 involving C.W., a fourteen-year-old girl. According to C.W.'s testimony, she was on her way to school when she saw "[a] man standing there with his penis out." She described the man as wearing a "[b]lue-and-white plaid jacket" and a yellow ski mask, due to which she was unable to see his face. C.W. ran toward her school, and quickly encountered Leonard Wimbush. According to Wimbush, he saw a man emerge from the bushes and followed after him, but was unable to continue his pursuit after the man jumped a fence. Wimbush returned to the front of the building and waited for the police.

When officers arrived, Wimbush joined Officer Olschewski to search for the suspect. During the search, Officer Olschewski came upon an individual wearing a gray sweatshirt. The officer asked the man (later identified as defendant) if he had seen anyone suspicious in the area, to which the man responded, "The gentleman who was exposing himself is on the track bed." Because Olschewski had not mentioned that he was looking for an individual who had "exposed himself," Olschewski became interested. Defendant started to walk toward the back of the house to obtain his identification, and then ran away. Wimbush tackled the man, and Officer Olschewski placed him under arrest. Olschewski searched the area for the jacket, and bandana or ski mask, that the suspect had been described as wearing. Olschewski discovered a coat that fit the description; the bandana or ski mask was not found.

Defendant was transported to C.W.'s school, where he was required to stand between an officer and Wimbush so C.W. could view him through glass doors. When asked about her identification of defendant, C.W. testified, "He just had on a black shirt. At first I didn't recognize him, then they put the jacket back on and I realized it was him." On cross-examination, C.W. acknowledged that prior to the showup, the police told her that they had caught the man that she had encountered on her way to school. She also testified that she never viewed a lineup, that she was never given pictures of other individuals, and that the only person they ever showed her was defendant.

Following the close of the State's case, defendant moved to strike C.W.'s identification, arguing that it was "tainted." Defense counsel noted that C.W. did not see defendant's face, that she recognized defendant only once the jacket was placed on him, that the officers never showed her any other suspects, and that Wimbush and the officer were standing next to defendant when he was identified. The trial court denied the motion, noting that, although one-on-one showup identifications are inherently suggestive, C.W.'s testimony was reliable because it was corroborated by Wimbush, who identified defendant and who provided a description that was essentially the same as the one provided by C.W. An issue also arose as to the court's obligation to charge lewdness as a lesser-included offense of fourth-degree criminal sexual contact. The court concluded that, although the definition of a "lewd" act includes similar language to that of fourth-degree criminal sexual contact, the disorderly persons offense was not a lesser-included offense of fourth-degree criminal sexual contact. Defendant was convicted on both counts.

Defendant appealed, contending that "[b]y placing the incriminating jacket on defendant after C.W. failed to identify defendant without the jacket, the police violated defendant's [due process] right to be free from suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification." Defendant also challenged his sentence and the trail court's failure to charge lewdness as a lesser-included offense. The Appellate Division affirmed defendant's conviction and sentence. The panel agreed that the showup procedure was suggestive, but found it to be reliable nonetheless. The panel dispensed with the lesser-included-offense argument on the basis of the doctrine of invited error and held that defendant's sentence was not excessive. The Court granted defendant's petition for certification. 218 N.J. 531 (2014).

**HELD**: In determining the reliability of evidence obtained through a suggestive showup identification procedure, extrinsic evidence of guilt should play no role in the determination of the evidence's admissibility. A reliability assessment must restrict its focus to the accuracy and trustworthiness of the specific identification. In this matter, the showup was impermissibly suggestive, and evidence from that showup was assessed for reliability under an erroneous analysis. Defendant's conviction is reversed and the matter is remanded for new proceedings.

1. The admissibility of a pretrial identification in New Jersey follows the principles first articulated in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). Under the Manson framework, "a court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a 'very substantial likelihood of irreparable misidentification.' In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." State v. Madison, 109 N.J. 223, 232 (1988). Both federal and state courts in other jurisdictions have interpreted Manson to stand for the proposition that extrinsic evidence of guilt should play no part when courts analyze the independent reliability of an inherently suggestive identification procedure. The Court expressly adopts that standard in this matter. (pp. 19-26)

2. Against that backdrop, the Court conducts a Manson/Madison analysis, and concludes that the showup identification procedure used in this matter was suggestive. C.W. was told that the police had caught the suspect and were bringing him to where she could view him. C.W. also "realized" the suspect in the showup was the person she had encountered only when the jacket was placed on him. That combination of features renders the showup impermissibly suggestive, requiring examination under the next step of the Manson/Madison test -- the reliability of C.W.'s identification. On balance, the indicia of reliability set forth in Manson do not support the reliability necessary to permit the admission of an out-of-court identification of defendant. That is so particularly since C.W. stated that she never saw defendant's face and she never identified him. C.W. only identified a jacket that defendant was not wearing when he was arrested and which he was made to wear during the showup so C.W. could view him in a piece of clothing that resembled her description of the jacket worn by the person she had seen. (pp. 26-29)

3. In the Appellate Division's consideration of the reliability of C.W.'s identification testimony, the panel considered circumstantial evidence corroborating defendant's guilt as evidence of the reliability of the identification. The reliability assessment must remain fixed on the indicia of reliability identified in Manson, which focus on the accuracy and trustworthiness of the witness's memory and perception, and not drift into consideration of circumstantial evidence of guilt such as would be pertinent in a harmless error analysis. Allowing the latter considerations to wander into the analysis risks engendering a violation of the Due Process Clause of the United States Constitution and Article I, Paragraph 1 of the New Jersey Constitution. (pp. 29-31)

4. The State argues that C.W.'s testimony is admissible because she was simply identifying the blue-and-white plaid jacket in her testimony, not the defendant. The State maintains that, because identification of an inanimate object does not raise the same due process concerns as identification of a person, C.W.'s testimony was properly admitted at trial. The Court finds the State's argument unpersuasive. Placing a jacket on a person after his arrest and using that item of clothing during the eyewitness identification procedure when a witness is having difficulty identifying the suspect raises due process concerns. (pp. 31-37)

5. The Court addresses the issue of the lesser-included offense to provide assistance in the retrial of this matter. State v. Zeidell, 154 N.J. 417, 433 (1998), stands for the proposition that fourth-degree lewdness is a lesser-included offense of sexual assault. Because of the similarity in the language between lewdness in the fourth-degree and lewdness as a disorderly persons offense, and the manner of identifying the victim being an insignificant difference in this regard, the reasoning in Zeidell should extend to the criminal sexual contact charge. On retrial, disorderly persons lewdness as a lesser-included offense to criminal sexual contact should be charged. (pp. 37-40)

The judgment of the Appellate Division is **REVERSED**, defendant's conviction is **REVERSED**, and the matter is **REMANDED** for further proceedings.

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and SOLOMON join in JUSTICE LaVECCHIA's opinion. JUSTICE FERNANDEZ-VINA and JUDGE CUFF (temporarily assigned) did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

HOWARD JONES,

    Defendant-Appellant.


       Argued September 16, 2015 – Decided January 20, 2016

       On certification to the Superior Court, Appellate Division.

       Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney).

       Deborah C. Bartolomey, Deputy Attorney General argued the cause for respondent (John J. Hoffman, Acting Attorney General of New Jersey, attorney).

       Lawrence S. Lustberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Gibbons, attorneys; Mr. Lustberg and Joseph A. Pace, on the letter brief).

    JUSTICE LaVECCHIA delivered the opinion of the Court.

    In determining the reliability of evidence obtained through a suggestive showup identification procedure, extrinsic evidence of guilt should play no role in the determination of the evidence's admissibility.  An analysis that considers evidence

1

of guilt is no substitute for a proper assessment of the reliability of an identification; for purposes of complying with constitutional due process requirements, a reliability assessment must restrict its focus to the accuracy and trustworthiness of the specific identification. Today we join those federal and state jurisdictions that have expressly so held when applying the due process requirements established in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). In this matter, the showup procedure employed was impermissibly suggestive, and evidence from that showup was assessed for reliability under an erroneous analysis. For the reasons expressed, we reverse the conviction of defendant, Howard Jones, and remand for new proceedings.

I.

On August 26, 2009, defendant was charged with third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4, and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). Those charges focused on events that took place on the morning of March 24, 2009, involving C.W., a fourteen-year-old girl. The following facts are gleaned from the evidence presented at trial.

A. The Incident

According to C.W.'s testimony, while walking to school in Trenton and approaching a convenience store, she noticed an

2

adult man who appeared to be following another girl. C.W. said that the man caught her attention because, although he was walking toward her, "[w]hen he saw [her,] he turned around and started walking the other way." She described the man by what he wore: a blue-and-white-checkered jacket, black pants, and a yellow ski mask.

C.W. briefly entered the convenience store to make a purchase and then continued walking on the same street on which she had been travelling. C.W. testified that she was further along that street when she heard "somebody . . . ma[k]e a little whisper sound," sounding like "Pssst." She turned toward the direction of the sound and "saw [a] man standing there with his penis out." C.W. answered affirmatively to the following two questions asked by the prosecutor: (1) "Now, when you said he was playing with it, was he moving his hand on his penis?" and (2) "Was he looking at you?" She described the man as wearing a "[b]lue-and-white plaid jacket" and a yellow ski mask, due to which she was unable to see his face. C.W. took flight, running toward her school, and quickly encountered Leonard Wimbush putting a child into a car. She testified that she informed Wimbush that "some man flashed [her]."

Wimbush also testified at trial about his encounter with C.W. and the events that ensued. He stated that on the morning of March 24, 2009, he was putting his son into a family member's

3

car when a visibly distressed C.W. approached him. Wimbush testified that when he looked in the direction toward which C.W. had pointed, he saw bushes moving and a man emerge from the bushes wearing "an old work lumber jacket, blue and gray and white," with jeans, blue or black in color. According to Wimbush, the man "had sort of a hood on, but it wasn't like a masking hood. It was just like trying to cover his face." Wimbush described the hood as blue with "something orange that stuck out [from it]."

According to Wimbush, he attempted to ask the man what was going on, but the man ran around the back of an apartment building. Wimbush stated that he followed the man, making eye contact with him "for a good three to five seconds" while nothing obstructed the man's face. After the man jumped a wooden fence, Wimbush was unable to follow him, so, according to Wimbush's testimony, he returned to the front of his apartment building, instructed a crossing guard to call the police, retrieved a pair of sneakers and cell phone from his apartment, and returned outside to await the arrival of the police. Officer Olschewski arrived first; he also testified at trial.

According to Olschewski's testimony, Wimbush told him about the girl who, in her distress, had approached Wimbush and stated that a man had exposed himself to her. Olschewski testified that Wimbush had described the man as a "black male,

4

approximately in his 40s.  He was wearing black pants, [and] a black coat that was plaid with . . . gray stripes in it."  A second responding policeman, Officer Cruz, also testified at trial.  According to Cruz's testimony, he was given a description of the suspect as wearing "a yellow ski mask, blue-and-white plaid jacket[,] and dark jeans."

Cruz testified that he began searching the area near where the incident reportedly took place but soon received a call to report to Joyce Kilmer Elementary School to investigate another complaint involving an incident of a sexual nature.  That turned out to be the same matter involving C.W., who had arrived at her school and had informed school personnel of the incident.

In the interim, Officer Olschewski and Wimbush were searching for the suspect in Olschewski's patrol car, according to the officer's testimony.  Olschewski testified that near an abandoned railroad track bed that he knew many "people use . . . as a shortcut to walk down the road," he spotted an individual in dark clothing about 200 yards away.  According to Wimbush's testimony, the man they saw was wearing a jacket like the one Wimbush had described earlier, but he was "at least a good football field length away."  The individual saw the patrol vehicle and began walking farther away, in a direction toward Oakland Street.  Olschewski drove to 343 Oakland Street and parked while Wimbush ran ahead in search of the suspect.

5

Passing between houses located at 343 and 345 Oakland Street and heading toward the railroad track bed, Wimbush saw a man, later identified as defendant, handling a trash can. He was not wearing the jacket Wimbush had observed earlier. Wimbush testified that, at the time, he believed the person merely to be a resident taking out the trash, so he kept searching.

According to Olschewski's testimony, shortly thereafter he came upon the same individual carrying a yellow recycling can and wearing a gray sweatshirt with lettering. The officer asked the man (later identified as defendant) if he had seen anyone suspicious in the area, to which the man responded: "The gentleman who was exposing himself is on the track bed." Because Olschewski had not mentioned that he was looking for an individual who had "exposed himself," Olschewski became interested in the man.

Olschewski testified that he asked the man for his name and identification. After first indicating that his identification was inside a house to which he made a passing gesture, Olschewski told the man to obtain his identifying information because he had become a witness. Stating that the front door was locked, the man started to walk toward the back of the house, dropped the recycling can, and ran toward the railroad track bed, away from the officer. Olschewski testified that he called into dispatch that he was in foot pursuit of a suspect

6

and began yelling for defendant to stop; his shouts were loud enough for Wimbush to hear. Wimbush testified that he saw defendant running towards him, and Wimbush tackled him. Officer Olschewski placed defendant in handcuffs and arrested him. He then read defendant his Miranda[1] rights.

According to the evidence at trial, after other officers arrived at the scene, Olschewski searched the area for the jacket, and bandana or ski mask, that the suspect had been described as wearing. He testified that he discovered a coat that fit the description he had been given "[a]t the rear of 343 Oakland Street, next to the other recycling cans." At trial, Officer Olschewski identified the jacket that he had found. Also, at trial, both C.W. and Wimbush identified the jacket found as the one the suspect had been wearing. The bandana, or ski mask, that the perpetrator allegedly was wearing at the time of the incident was not found.

As noted earlier, C.W. testified that she had continued on her way to school and, on arrival, told a school security guard what happened. The security guard called the police and, eventually, C.W. was retrieved from class to speak with Officer Cruz, to whom she relayed her experience of encountering a man who had exposed himself to her while on her walk to school. By

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that point, Olschewski had arrested defendant and, via police radio, had informed Officer Cruz that he had a suspect in custody whom he was transporting to the school.

### B. The Showup

At the school, defendant was required to get out of the police vehicle and to stand between an officer and Wimbush so C.W. could view him through the glass entryway doors to the school. During C.W.'s direct testimony she described how she made her identification.

> [Prosecutor:] Now, you said they showed you the man and he was outside; is that right?
>
> [C.W.:] Yes.
>
> [Prosecutor:] Okay. What was he wearing, do you remember?
>
> [C.W.:] He just had on a black shirt. At first I didn't recognize him, then they put the jacket back on and I realized it was him.
>
> [Prosecutor:] Okay. So you recognized the jacket; is that correct?
>
> [C.W.:] Yes.

On cross-examination, C.W. acknowledged that prior to the showup, the police told her that they had caught the man that she had encountered on her way to school. She also testified that she never viewed a lineup, that she was never given pictures of other individuals, and that the only person they

8

ever showed her was defendant. Her cross-examination also revealed the following:

> [Defense Counsel:] You testified he was wearing a ski mask; is that correct?
>
> [C.W.:] Yes.
>
> [Defense Counsel:] So his face was covered?
>
> [C.W.:] Yes.
>
> [Defense Counsel:] So you wasn't sure what he looked like as far as his face, correct?
>
> [C.W.:] Yes.
>
> [Defense Counsel:] All right. Did they show you a ski mask?
>
> [C.W.:] No.
>
> [Defense Counsel:] So, when you say you recognized [defendant], you really didn't recognize [defendant], you recognized the jacket; is that correct?
>
> [C.W.:] Yes.

Contrary to C.W.'s testimony, Officer Olschewski testified that he placed the jacket on defendant prior to arriving at the school. He said that "prior to getting to the school, I did put the coat, that was recovered at the rear of the scene [near where defendant was arrested], onto the arrestee, and I put the cuffs back on him." In his testimony, Olschewski informed the jury that he stood near defendant during the showup identification and that, "not even a short time later, [he] was advised that the victim had identified the defendant as the

party who had exposed himself to her." Wimbush's testimony confirmed that he too stood near defendant during the showup identification.

According to Officer Cruz's testimony, defendant "was wearing a plaid jacket and dark pants" when C.W. identified him; Cruz identified defendant in court as the man that C.W. "identified" at the school. Thus, although C.W. testified that she could not identify the man brought to her for the showup and that she could identify only the jacket once it was on him, both Olschewski and Cruz testified that she, the victim, "identified" defendant. Indeed, the trial court included an identification charge when instructing the jury.

## C. Trial Motions

Following the close of the State's case, the defense moved to strike C.W.'s identification from the record, arguing that it was "tainted." In support of that argument, defense counsel noted that C.W. testified that she did not see defendant's face, that she recognized defendant only once the jacket was placed on him, that the officers never showed C.W. any other suspects, and that Wimbush and the officer were standing next to defendant when he was identified. Defense counsel asserted that had he known all of those facts in advance of C.W.'s testimony, he would have moved for the evidence's exclusion.

In denying the motion, the court noted that, although one-on-one showup identifications are inherently suggestive, C.W.'s testimony was reliable because it was corroborated by Wimbush, who identified defendant and who provided a description of the suspect's physical appearance that was essentially the same as the one provided by C.W. Specifically, the court stated:

> Now with regard to the motion to strike . . . the victim['s] . . . description of the defendant, at least as she testified to it in court, based on [United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)] and the taint caused when the police had the defendant put on the jacket that had been identified by her at the time she viewed him at the school, I would note that one-on-one showup[] [identifications] are inherently suggestive.
>
> . . . .
>
> Here, there was a showup [identification] when Officer Olschewski brought the defendant to the school where the victim . . . was. She identified the jacket which the defendant was made to wear by the officer, and I have placed on the record her testimony. I'll just review it quickly. She said the jacket -- she observed the jacket the man had on, that was how she was able to make her identification. She remembered the man wearing the jacket. She testified she did not see his face, nor did she recognize it when first shown. Now, that's how she identified the defendant, as the man in the jacket. She did not identify him in court, as I pointed out. She testified to what occurred on [the date of the incident], that was her basis for identifying the man wearing the jacket.

11

The court analogized the case to <u>Stovall v. Denno</u>, 388 <u>U.S.</u> 293, 87 <u>S. Ct.</u> 1967, 18 <u>L. Ed.</u> 2d 1199 (1967), in which the police took a defendant to the hospital room where a victim was being treated and conducted a showup identification. In finding that case analogous, the trial court noted:

> Here, only [the victim] could identify the defendant as having exposed himself to her. I note that the school was nearby where this occurred. And . . . if it wasn't this defendant, then the flasher, the person who was exposing himself, was still on the loose and probably nearby.
>
> I find that this is not a due-process violation. The procedure here occurred very soon after the incident. And I note that Mr. Wimbush also testified that he had seen a man [wearing] a distinct pattern, a plaid lumber jacket in the bushes. So I find this is not a due-process violation that would result in suppression or striking [the victim's] identification from the trial record or her testimony in that regard.

Defense counsel persisted and requested a clarification of the court's ruling:

> [Defense Counsel]: Thank you, your Honor. Your Honor, I want to be also asking for clarification on your ruling, because what I was arguing as far as the identification, what was wrong with the identification, was not that they brought Mr. Jones to the school but what they did when they brought him to the school as far as placing evidence upon him.
>
> THE COURT: No, your basis was that they brought him to the school --
>
> [Defense Counsel]: And changed his appearance.

12

THE COURT: -- and made him wear the jacket.

[Defense Counsel]: Correct.

THE COURT: And that he was brought to the school by the police.

[Defense Counsel]: Correct. But the main emphasis of my argument is them placing the jacket upon him. Because you have a witness who didn't see his face, who couldn't identify him, and then you place evidence from the charge, something that at least looks like evidence, if it wasn't from the original perpetrator or not, but it's the same jacket or similar, either way, you're placing that upon my client to look more -- in other words, you're making him fit the description as opposed to him fitting it just by being there.

THE COURT: No, I understand your argument. That is part of the totality of the considerations.

[Defense Counsel]: Okay.

THE COURT: At least the totality of factors I took into account in my ruling. I think, though, what I am saying also to you, I'm denying that motion that you made.

The only additional point of concern in this appeal is that after the parties rested, an issue arose as to the court's obligation to charge lewdness as a lesser-included offense of fourth-degree criminal sexual contact based on C.W.'s testimony that the man she had seen in the bushes had "flashed" her. After discussion in which the defense argued against the charge being given and the State reviewed law that was suggestive of an obligation to provide the charge, the trial court determined not

13

to charge lewdness as a lesser-included offense.  After giving the issue thoughtful attention, the court concluded that, although the definition of a "lewd" act includes similar language to that of fourth-degree criminal sexual contact, the language regarding knowledge contained in "lewdness" as a disorderly persons offense differed significantly from that of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b); that difference, according to the court, meant that the disorderly persons offense was not a lesser-included offense of fourth-degree criminal sexual contact.

Defendant was convicted on both counts of the indictment and was sentenced to a five-year term for endangering the welfare of a child, with a two-year period of parole ineligibility, and a concurrent eighteen-month term for fourth-degree criminal sexual contact.  The court imposed appropriate fines and fees.

On appeal, defendant asserted that "[b]y placing the incriminating jacket on defendant after C.W. failed to identify defendant without the jacket, the police violated defendant's [due process] right to be free from suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification."  Defendant also claimed on appeal that the trial court committed reversible error in failing to charge lewdness as a lesser-included offense

14

of both counts one and two, endangering the welfare of a child and criminal sexual contact, and that his sentence was excessive.

The Appellate Division affirmed the conviction and sentence. As to the first issue, the panel agreed that the showup procedure used here was suggestive, but found it to be reliable nonetheless and thus the testimony was properly admitted. In so concluding, the panel pointed to the following facts:

> 1) the procedure occurred "very soon" after the incident; (2) the victim and Wimbush gave matching descriptions of defendant's clothing before the show-up; (3) without being prompted, defendant told Officer Olschewski that "the gentleman who was exposing himself is on the track bed"; (4) after Olschewski told defendant that he was a witness, defendant dropped the yellow can and started running away towards the track bed; (5) Olschewski searched the surrounding area and found a blue-and-white jacket by the recycling can behind the house on Oakland Street; (6) Cruz testified that defendant was the man the victim identified at the school; (7) Wimbush testified that defendant was the man he had seen jump out of the bushes; and (8) the victim and Wimbush testified that the jacket Olschewski found was the one they had seen on defendant.

The panel dispensed with the lesser-included-offense argument on the basis of the doctrine of invited error and held that defendant's sentence was not excessive.

Defendant petitioned for certification on the admissibility of C.W.'s identification and on whether the disorderly persons offense of lewdness constituted a lesser-included charge on which the jury should have been instructed. We granted the petition. State v. Jones, 218 N.J. 531 (2014). We also granted amicus curiae status to the American Civil Liberties Union of New Jersey (ACLU-NJ).

## II.

Defendant's arguments track those he advanced to the trial court and Appellate Division. He contends that the showup was suggestive and that C.W.'s identification testimony should not have been admitted. His argument focuses, in particular, on the crucial role that putting the jacket on defendant played in C.W.'s identification. Defendant argues that it was due only to the jacket that C.W. was able to "realize" it was defendant; she otherwise testified that she never saw his face and admitted that she was unable to identify him at trial. Moreover, defendant claims that there was no independent verification of C.W.'s identification.

Both defendant and the ACLU-NJ stress the persuasiveness of out-of-state jurisprudence that holds that the reliability of a suggestive identification procedure cannot be established by extrinsic evidence of guilt. They rely on the Second Circuit Court of Appeals' decision in Raheem v. Kelly, 257 F.3d 122 (2d

16

Cir. 2001), because it involved reversal of a conviction where an identification was aided by the fact that the defendant was required to appear in a lineup as the only person wearing a distinctive piece of clothing, and the clothing played a significant role in the identifications made from that lineup. Defendant in this case urges this Court (1) to conclude that due process considerations require that a reliability assessment in a suggestive identification process remain distinct from a harmless error assessment based on extrinsic evidence of guilt; and (2) to find that reliability is absent here.

Further, defendant reasserts his appellate argument on the lesser-included status of the disorderly persons offense of lewdness to the charges filed against defendant in this matter. Regardless of whether defendant wanted the charge at the time of trial, defendant maintains that the trial court's failure to give a charge on the lesser-included offense constituted reversible error. Defendant contends that disorderly persons lewdness should have been charged as a lesser-included offense of both criminal sexual contact and endangering the welfare of a child.

Before this Court, the State primarily argues that principles of eyewitness identification are not implicated because C.W. did not identify defendant, she merely identified the jacket. The State cites several decisions addressing

17

standards applicable to identifications of inanimate objects, which the State argues were not violated here. The State maintains that inferences that were drawn from C.W.'s identification of physical evidence should not necessitate a reversal. Rather, the State contends that C.W.'s testimony was admissible and subject to assessment in the context of the totality of the evidence, including the identification testimony of Wimbush and Officer Olschewski, in which they recounted defendant's suspicious behavior when encountered by police. Further, the State distinguishes the lineup in Raheem from the showup identification procedure in this matter.

As for defendant's lesser-included offense argument, the State asserts that lewdness is not a lesser-included offense of either criminal sexual contact under N.J.S.A. 2C:14-3(b) or child endangering under N.J.S.A. 2C:24-4 because neither include the element of acting "for the purpose of arousing or gratifying the sexual desire of the actor or of any other person" that is contained in N.J.S.A. 2C:14-4(c), lewdness.

As amicus curiae, the ACLU-NJ focuses on the admissibility of C.W.'s identification testimony. The ACLU-NJ emphasizes three points: C.W. was told that officers had caught the suspect; the showup identification was inherently suggestive; and C.W.'s identification, such as it was, came only after officers placed on defendant the jacket that the officers had

18

found, rendering this an identification based on distinctive clothing. The ACLU-NJ argues that, when an identification arises from an impermissibly suggestive identification procedure, due process can be satisfied, and the admission of the identification evidence can be permitted, only if the identification satisfies Manson's reliability criteria. And, importantly, extrinsic evidence of guilt may not be considered in that due process inquiry. Otherwise, the ACLU-NJ contends, consideration of extrinsic corroborating evidence of guilt "confuses the due process inquiry" with the test for harmless error (citing Raheem, supra, 257 F.3d at 140). The ACLU-NJ urges that we recognize, as other courts have, that the Manson test for reliability must rest on the indicia outlined in that opinion: opportunity to view, degree of attention, accuracy of prior description, level of certainty, and time between crime and identification. Not one of those indicia of reliability provided a basis for admitting C.W.'s testimony; therefore, the ACLU-NJ urges that we reverse defendant's conviction based on the proceedings that occurred here.

### III.

A question of law is before us. We must determine whether constitutional due process requirements should have compelled the exclusion of an out-of-court identification from defendant's criminal trial. We review de novo that question of law.

19

Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999).
If a due process violation is found, a new trial will be
required unless we can determine that the constitutional
violation was harmless beyond a reasonable doubt.  See State v.
Madison, 109 N.J. 223, 245-46 (1988).

The admissibility of a pretrial identification in New
Jersey follows the principles first articulated in Manson,
supra, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140.  See
Madison, supra, 109 N.J. at 239-40.[2]  In Manson, supra, the
Supreme Court reviewed an identification made by an undercover
narcotics officer of a previously unknown person from whom the
officer had purchased narcotics.  432 U.S. at 100-01, 97 S. Ct.
at 2245-46, 53 L. Ed. 2d at 145-46.  The Court's opinion in
Manson acknowledged the suggestiveness of displaying a single
photograph to an identifying individual but held that the
"corrupting effect" of the suggestive procedure did not outweigh
the ability of the officer to make a reliable, accurate
identification.  Id. at 116, 97 S. Ct. at 2254, 53 L. Ed. 2d at
155.  Because the Court did not find "under all the
circumstances" that there was "a very substantial likelihood of

---

[2] State v. Henderson, 208 N.J. 208 (2011), revised the guidelines
for evaluating out-of-court identifications; however, the
decision was made prospective in application.  Id. at 302.
Because the events underlying this case arose before the
Henderson decision was handed down, the guidelines established
in Manson/Madison are applicable to this matter.

irreparable misidentification," the Court held that the evidence should be weighed by the jury. Ibid. (internal quotation marks and citations omitted).

In Madison, supra, we summarized the Manson framework to be used in our criminal trials:

> [A] court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence.
>
> [109 N.J. at 232 (citations omitted).]

A finding of impermissive suggestibility requires an examination of the totality of the circumstances of the identification to determine whether exclusion is appropriate. Id. at 234. "'[E]xclusion of the evidence [is required] where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist.'" Ibid. (quoting State v. Farrow, 61 N.J. 434, 451 (1972), cert. denied, 410 U.S. 937, 93 S. Ct. 1396, 35 L. Ed. 2d 602 (1973)).

One-on-one showups are inherently suggestive "because the victim can only choose from one person, and, generally, that person is in police custody." State v. Herrera, 187 N.J. 493, 504 (2006). That is not to say that, "standing alone," each and every showup warrants proceeding to the second step of the examination. Ibid. Our law has permitted "on or near-the-scene identifications because they are likely to be accurate, taking place . . . before memory has faded and because they facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent." Ibid. (internal quotation marks and alterations omitted).

Other factors can bear on the suggestiveness of a showup identification procedure, such as when the police signal to the identifying witness that they have apprehended the culprit. See id. at 506. In Herrera, statements by police that "we found your car, we located your car with somebody in it, we want you to come with us to identify the person[,]" "in combination with the suggestiveness inherent in a showup" rendered the police procedure impermissibly suggestive. Ibid. Decisions of sister jurisdictions also recognize that the suggestiveness of such signals by police officials may depend on whether it is apparent to the witness that the police think they have caught the perpetrator. Compare United States v. McGrath, 89 F. Supp. 2d

22

569, 581 (E.D. Pa. 2000) (finding that police statements merely informed witness that police apprehended suspect), with State v. Williams, 545 P.2d 938, 941 (Ariz. 1976) (finding identification suggestive where "suspect was viewed in the stationhouse, manacled, and the victim was told that she was to observe a man who had been apprehended driving her car"), and State v. Davis, 767 A.2d 137, 142 (Conn. App. Ct. 2001) (finding identification unnecessarily suggestive where officer told rape victim, "[w]e got him, we got him. . . . We had two boys. You got to tell which one, who it is").

Numerous considerations can implicate suggestiveness. The model charge on in-court and out-of-court identifications contains an array of considerations that bear on suggestiveness and are relevant for jury consideration when identifications are determined to be admissible. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (2007). However, before the identification evidence may be put before the jury, the court must determine whether the identification is sufficiently reliable to avoid the substantial likelihood of misidentification. "[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154.

23

As set forth in Manson, the following factors are relevant: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Ibid. Importantly, in Manson, the majority indicated that, when evaluating the reliability of a suggestive identification procedure, courts should not consider any extrinsic evidence of guilt. Id. at 116, 97 S. Ct. at 2254, 53 L. Ed. 2d at 155. Justice Stevens underscored that in his concurrence in Manson, stating that, "in evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side. . . . [But here] the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself." Id. at 118, 97 S. Ct. at 2255, 53 L. Ed. 2d at 156 (Stevens, J., concurring).

Both federal and state courts in other jurisdictions have interpreted Manson to stand for the proposition that extrinsic evidence of guilt should play no part when courts analyze the independent reliability of an inherently suggestive identification procedure. See, e.g., United States v. Greene, 704 F.3d 298, 310 (4th Cir. 2013) ("[E]vidence extrinsic to an identification cannot be considered in evaluating the

24

reliability of the identification." (emphasis omitted)); Raheem, supra, 257 F.3d at 141 (concluding "that evidence of record that is unrelated to an identification but that is supportive of a finding of guilt is properly considered in harmless-error analysis, not in the due process inquiry of whether the identification has reliability"); United States v. Rogers, 126 F.3d 655, 659 (5th Cir. 1997) ("[A]dmissibility rests on the reliability of the identification judged solely by the circumstances indicating whether it was likely to be a well-grounded identification, not whether it seems likely to have been correct in light of other available evidence." (citation omitted)); Graham v. Solem, 728 F.2d 1533, 1546 (8th Cir. 1984) ("[O]ther evidence of guilt does not play a formal role in the analysis" of admissibility of eyewitness identification); see also Wise v. Commonwealth, 367 S.E.2d 197, 201 (Va. Ct. App. 1988) ("[O]ther evidence of a defendant's guilt, not dealing with the individual eyewitness's personal observation and memory, plays no part in the analysis of the reliability of that eyewitness's identification."); Richards v. People of the Virgin Islands, 53 V.I. 379, 388 n.4 (V.I. 2010) ("Consistent with the majority of jurisdictions, it is evident that corroborating evidence of guilt would be relevant only to a harmless error analysis."). We conclude that those cases affirm what was made abundantly clear through Justice Stevens's concurring opinion in

25

Manson: that extrinsic evidence of guilt plays no role in assessing whether a suggestive eyewitness identification was nonetheless inherently reliable. We expressly hold that to be the standard that must apply in this matter.

With that as our backdrop, we turn to the disputed identification evidence admitted in this appeal.

IV.

A.

We begin first with C.W.'s identification of defendant. She was careful in her testimony on direct and cross-examination to answer that she did not see defendant's face, that she could not identify defendant at trial, and that it was only when the jacket was placed on defendant at the showup that she "realized" it was him. Officer Olschewski went further in his testimony, stating that the "victim . . . identified the defendant as the party who had exposed himself to her." Similarly, Wimbush testified that at the showup, "she (C.W.) pointed out the suspect." And, Officer Cruz's testimony went furthest in characterizing what C.W. did as an identification of defendant. He testified that "[C.W.] identified him, through the school glass doors, as being the suspect." When asked how that identification was accomplished, Cruz responded, "[s]he pointed at him as being the one that she saw in the bushes."

26

This case thus was presented as an identification case, and in fact an identification charge was given by the court. Accordingly, we must perform a Manson/Madison analysis. As for the first inquiry into whether this showup identification procedure was suggestive, certainly it was. First, Herrera noted the inherent suggestibility of showups. Second, here C.W. was told that the police had caught the suspect and were bringing him to where she could view him. Third, according to C.W., she "realized" the suspect in the showup was the person from the bushes whom she had encountered on her way to school only when the jacket, which she believed to be distinctive, was placed on him. Thus, this showup identification procedure was made even more suggestive by the use of distinctive clothing, even though defendant was not wearing the clothing when detained and arrested by the police. That combination of features renders this showup impermissibly suggestive, requiring examination under the next step of the Manson/Madison test. Although not dispositive, it bears noting that the suggestiveness of the procedure was enhanced by the fact that defendant was presented to C.W. by having him stand between a police officer and the man to whom she had turned in her distress -- her rescuer, Mr. Wimbush.

Having determined that the showup was impermissibly suggestive, the reliability of C.W.'s identification, for due

27

process purposes, requires examination. Utilizing the indicia of reliability set forth in Manson, it is apparent from this record that this identification falls short of the mark. First, C.W. had no opportunity to view defendant's face at the time of the crime because, according to her, he was wearing a ski mask. Second, there is no indication that C.W. paid a great deal of attention to the man's features at the time of the offense because she took off running as soon as she saw that his penis was exposed. Third, C.W.'s description was detailed only as to defendant's clothing and, according to C.W., no one else could have possibly been wearing a plaid lumberjack work jacket of the type she recalled. Fourth, C.W. testified that when the suspect -- defendant -- was initially presented for her viewing outside her school, she did not recognize him, undermining the certainty of her identification of defendant. Finally, on the last criterion, the time between the incident and the showup was approximately 1.5 hours in duration, an amount of time that does not undermine reliability.

On balance, that analysis does not support the reliability necessary to permit the admission of an out-of-court identification of defendant. That is so particularly since C.W. stated that she never saw defendant's face and she never identified him. Rather, C.W. only identified a jacket that defendant was not wearing when he was arrested and which he was

28

made to wear during the showup so C.W. could view him in a piece of clothing that resembled her description of the jacket worn by the person she had seen earlier in the day. That is insufficient to support a reliable identification by C.W. of defendant the person. Officers Olschewski's and Cruz's testimony, as well as Wimbush's, expanded on what actually transpired at the showup, calling it an identification by C.W. of defendant. There was insufficient reliability to support any such identification by C.W. of defendant.

In the Appellate Division's consideration of the reliability of C.W.'s identification testimony, the panel considered circumstantial evidence corroborating defendant's guilt as evidence of the reliability of the identification. Specifically, the Appellate Division relied on the following evidence in the record: (1) defendant's statement that "the gentleman who was exposing himself is on the track bed"; (2) defendant's retreat after the officer told him he was a witness; (3) the discovery of the blue-and-white jacket by the recycling bins where defendant had been when first encountered by Wimbush and Olschewski; (4) officer testimony that C.W. identified defendant at the school; (5) Wimbush's identification of defendant as the person he chased; and (6) C.W.'s and Wimbush's identification of the jacket. Those factors constitute circumstantial evidence of defendant's guilt, but they do not

29

indicate that C.W.'s identification was reliable. The reliability assessment must remain fixed on the indicia of reliability identified in Manson, which focus on the accuracy and trustworthiness of the witness's memory and perception, and not drift into consideration of circumstantial evidence of guilt such as would be pertinent in a harmless error analysis. Allowing the latter considerations to wander into the analysis risks engendering a violation of the Due Process Clause of the United States Constitution and Article I, Paragraph 1 of the New Jersey Constitution.

We reject the State's argument that no eyewitness identification occurred and that, therefore, a due process issue does not exist. The State could have presented this case based on the victim's identification of a jacket, but the prosecution went further. Trial testimony from C.W., Wimbush, and Officers Olschewski and Cruz informed the jury that C.W. made an identification of defendant at the school. We hold that, to the extent that C.W. purported to "identify" defendant, her identification of defendant the person was unreliable and created the risk of a substantial likelihood of misidentification in the way it was presented to the jury. We further hold that the testimony of Olschewski, Cruz, and Wimbush embellished on an equivocation in what C.W. was attempting to convey in her testimony regarding her identification of

30

defendant, as opposed to an identification of the clothing he was made to wear at the showup.  Their testimony added to the risk of a substantial likelihood of misidentification that occurred in defendant's trial.

B.

Alternatively, the State argues that C.W.'s testimony is admissible because she was simply identifying the blue-and-white plaid jacket in her testimony, not the defendant.  The State maintains that, because identification of an inanimate object does not raise the same due process concerns as identification of a person, C.W.'s testimony was properly admitted at trial.

Considerable authority holds that "due process concerns implicated in the pretrial identification of a person are not present in the identification of physical evidence."  State v. Delgado, 188 N.J. 48, 67 (2006); see also State v. Roscoe, 700 P.2d 1312, 1324 (Ariz. 1984) ("By the great weight of authority, the right to pretrial identification procedures is inapplicable to items of physical evidence."). But that generalization scrapes only the surface of an analysis involving identification of inanimate objects.  There are a number of cases that discuss identifications of inanimate objects, such as automobiles[3] and

---

[3] See Johnson v. Sublett, 63 F.3d 926 (9th Cir.), cert. denied, 516 U.S. 1017, 116 S. Ct. 582, 133 L. Ed. 2d 504 (1995); Inge v. Procunier, 758 F.2d 1010 (4th Cir.), cert. denied sub nom., Inge v. Sielaff, 474 U.S. 833, 106 S. Ct. 104, 88 L. Ed. 2d 85

weapons[4], and find that the identifications that took place were permissible and did not implicate due process. Identifying a car or a weapon is not equivalent to identifying an article of clothing that has been placed on a suspect during a showup, as happened in the present case. This is not a situation in which the officers merely showed C.W. the jacket they found in the vicinity near where defendant was located. That would have been a more analogous case to precedent approving the admission of testimony addressing the identification of an inanimate object apart from a person.

With respect to identifications at showup or lineup proceedings, courts have found that no due process concerns exist when (1) a witness or victim reported a particular or distinctive article of clothing worn by a suspect, and (2) a suspect is wearing that distinctive clothing when they are arrested by the police and the suspect is still wearing that distinctive clothing when presented to the witness or victim at

---

(1985); Buchanan v. State, 561 P.2d 1197 (Alaska 1977); Roscoe, supra, 700 P.2d 1312; People v. Coston, 576 P.2d 182 (Colo. App. 1977), aff'd, 633 P.2d 470 (Colo. 1981); State v. Bruns, 304 N.W.2d 217 (Iowa 1981); Rackley v. Commonwealth, 674 S.W.2d 512 (Ky. 1984); Commonwealth v. Jones, 514 N.E.2d 1337 (Mass. App. Ct. 1987); People v. Miller, 535 N.W.2d 518 (Mich. Ct. App. 1995); Hughes v. State, 735 So. 2d 238 (Miss. 1999); State v. Cyr, 453 A.2d 1315 (N.H. 1982); Delgado, supra, 188 N.J. 48.

[4] See Klase v. State, 346 A.2d 160 (Del. 1975); Dee v. State, 545 S.E.2d 902 (Ga. 2001); Brooks v. State, 560 N.E.2d 49 (Ind. 1990).

a lineup or showup proceeding. See Johnson v. Ross, 955 F.2d 178, 179-80 (2d Cir. 1982) (finding no due process violation where victim identified hat and coat worn by robbery perpetrator who was wearing same hat and coat when arrested and was identified less than one hour after robbery); Commonwealth v. Carter, 414 A.2d 369, 370-71 (Pa. Super. Ct. 1979) (finding no due process violation where defendant was arrested while wearing clothing that matched description given by witnesses to recent robbery, and was wearing same clothing during showup); State v. Johnson, 132 P.3d 767, 767-68 (Wash. Ct. App. 2006) (finding no due process violation where victim identified distinctive clothing worn by three defendants, who were arrested "[a] few minutes later" and were wearing clothing, at the time of their arrest, that victim had described); State v. King, 639 P.2d 809, 810 (Wash. Ct. App. 1982) (same).

Here, by contrast, defendant was arrested while wearing a gray sweatshirt. A blue-and-white plaid jacket was found near where he had been. When defendant was brought to the school for the showup identification, C.W. testified that she observed him initially only in a black tee shirt. Thereafter, she said, he was compelled to don the plaid jacket, and she "realized" that defendant was the suspect she reported to the police as having exposed himself to her. The intentional use of the jacket in the showup when defendant was presented to C.W. distinguishes

33

this case from the other cases discussing identification of inanimate objects.

The Second Circuit's decision in Raheem, supra, 257 F.3d 122, is instructive in this matter. In that case, three men robbed a bar, and one shot an owner of the bar during the course of that robbery. Id. at 125. The shooter was principally described by the witnesses as wearing a black leather coat. Id. at 125-26. Twenty days after the robbery/murder, three of the five witnesses to the crime viewed a police lineup. Id. at 126. One of the men who was placed in the lineup as a filler was the defendant. Ibid. The defendant had been arrested in connection with a completely unrelated matter and was participating in the lineup purely by happenstance; the police had identified another suspect as their focus and had him in the lineup. Ibid. The defendant was wearing a black leather coat when he was arrested for that other offense and was brought to the police station, and he was wearing that coat when the witnesses observed the lineup. Ibid. Defendant was the only person in the lineup wearing a black leather coat. Id. at 136.

The first witness to observe the lineup was unable to identify anyone as the shooter; however, a second witness identified defendant as the shooter, testifying at a Wade[5]

_____

[5] Wade, supra, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149.

34

hearing that defendant resembled the man he saw in the bar and "[h]e had on a leather coat that [he] remembered." Id. at 126-27 (emphasis omitted). After another witness was unable to make an identification, id. at 126, the first witness asked to view the lineup again, at which point he identified the defendant, id. at 127. At the Wade hearing, the first witness testified that he was not positive about the identification, but that "the black leather coat really set it off for [him]." Ibid. (emphasis omitted).

At trial, both witnesses who identified defendant at the lineup testified, and both indicated that the black leather coat played a significant role in their identifications of defendant at the lineup. Id. at 130-31. On appeal, the Second Circuit found that the lineup was inherently suggestive because the two witnesses who identified defendant had previously given descriptions to the police which emphasized the suspect's black leather coat. Id. at 135-36. Moreover, when discussing why they identified defendant at the lineup, both witnesses "repeatedly mentioned the impact of the coat." Id. at 136. Thus, the Second Circuit concluded that "the black leather coat . . . was an integral part of the description that each [of the two witnesses] provided to the police, and was a critical factor in those witnesses' selections of [defendant] from the lineup." Id. at 137.

The Second Circuit also found that the lineup procedure lacked independent reliability.  Id. at 138.  The court concluded that, given "the fact that both witnesses repeatedly cited the coat worn by [defendant] as influential in their selection of him, we cannot conclude that the identifications by [the witnesses] had reliability independent of the black leather coat."  Id. at 140.  Finally, the Second Circuit concluded that the error of admitting the eyewitness identification testimony was not harmless, because "[t]he identification testimony of [the witnesses] clearly bore on an essential issue, the identity of the shooter."  Id. at 142.

We find unpersuasive the State's argument that what occurred at this showup was an identification of an inanimate object.  Here, C.W. was not simply identifying a jacket being shown to her by the police because it had been found near where defendant was located.  Placing a jacket on a person after his arrest and using that item of clothing during the eyewitness identification procedure when a witness is having difficulty identifying the suspect raises due process concerns.

We hold that the showup procedure in this case required that the eyewitness identification be analyzed under the identification principles articulated in Manson/Madison, rather than principles governing an identification of the inanimate object.  Moreover, it was error on appellate review to consider

36

extrinsic evidence of guilt when evaluating the identification's reliability. We further hold that the use of the plaid jacket in this showup rendered the showup and the identification evidence that it generated a violation of defendant's due process rights, requiring a new trial. The cumulative testimony by Olschewski, Cruz, and Wimbush that C.W. identified defendant at the showup renders this error one that we cannot regard as harmless beyond reasonable doubt.

V.

In view of our holding that a new trial is required, we address the issue of the lesser-included offense to provide assistance in the retrial of this matter.

Under N.J.S.A. 2C:14-3(b), a person is "guilty of criminal sexual contact if he commits an act of sexual contact with [a] victim [who is at least 13 but less than 16 years old and the actor is at least four years older than the victim]."[6] Sexual contact is defined as:

> [A]n intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor.
>
> [N.J.S.A. 2C:14-1(d) (emphasis added).]

---

[6] The bracketed language represents the substantive content of the statute's short cross-reference to N.J.S.A. 2C:14-2(c)(4).

37

Similarly, a person commits disorderly persons lewdness if "he does any flagrantly lewd and offensive act which he knows or reasonably expects is likely to be observed by other nonconsenting persons who would be affronted or alarmed." N.J.S.A. 2C:14-4(a). The statute defines a "lewd act" as "exposing . . . the genitals for the purpose of arousing or gratifying the sexual desire of the actor or of any other person." N.J.S.A. 2C:14-4(c).

Our reasoning in State v. Zeidell, 154 N.J. 417 (1998), provides guidance in this matter. Zeidell stands for the proposition that fourth-degree lewdness is a lesser-included offense of sexual assault. Id. at 433. The defendant in Zeidell was convicted of sexual assault under N.J.S.A 2C:14-2(b), which is defined as committing "an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years older than the victim." Id. at 419, 423. There is substantial similarity in the statutory language of the statutes involved in Zeidell and those involved in this matter. We note first that, other than the age of the victim, the statutory language defining this form of sexual assault is identical to the statutory language defining criminal sexual contact with which defendant was charged. So Zeidell is pertinent due to the substantially identical language between those two potentially greater offenses to the offense of

38

lewdness.  Moreover, Zeidell also recognized that the only distinction between lewdness in the fourth-degree and lewdness as a disorderly persons offense is the identity of the victim. Id. at 430.  Because of the similarity in the language between lewdness in the fourth-degree and lewdness as a disorderly persons offense, and the manner of identifying the victim being an insignificant difference in this regard, the reasoning in Zeidell should extend to the criminal sexual contact charge involved in this matter.

Second, Zeidell recognized that the key distinction between lewdness and sexual assault was the difference between mere exposure of an intimate part and the sexual touching of that part.  Id. at 430-431.  During the trial, C.W. testified on direct examination that defendant was "playing with his penis," but on cross-examination, C.W. stated that a man had "flashed" her.  She also told Wimbush, as he reported it, that a man had "flashed" her.  The act of "flashing" as that term is used in general parlance can support a conviction for lewdness, but not for criminal sexual contact.  Given that ambiguity and potential contradiction in C.W.'s testimony, a reasonable jury could find defendant guilty of the lesser-included offense of lewdness if it was not persuaded that defendant had touched or manipulated his penis.  The question is one for the jury to determine after being charged on the lesser-included offense of lewdness as a

39

disorderly persons offense.  On retrial, disorderly persons

lewdness as a lesser-included offense to criminal sexual contact

should be charged.  We need not reach defendant's further

argument on whether disorderly persons lewdness is a lesser-

included offense of endangering the welfare of a child.

VI.

For the reasons expressed, the judgment of the Appellate

Division is reversed, defendant's conviction is reversed, and

the matter is remanded for further proceedings consistent with

this opinion.


    CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and
SOLOMON join in JUSTICE LaVECCHIA's opinion.  JUSTICE FERNANDEZ-
VINA and JUDGE CUFF (temporarily assigned) did not participate.

SUPREME COURT OF NEW JERSEY

NO.    A-112                              SEPTEMBER TERM 2013
ON APPEAL FROM        Appellate Division, Superior Court


STATE OF NEW JERSEY,

        Plaintiff-Respondent,

                v.

HOWARD JONES,

        Defendant-Appellant.


DECIDED          January 20, 2016
                 Chief Justice Rabner                    PRESIDING
OPINION BY       Justice LaVecchia
CONCURRING/DISSENTING OPINION BY
DISSENTING OPINION BY

| CHECKLIST | REVERSE/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | -------------------- | |
| TOTALS | 5 | |